Kathryn **FOSTER** and Frank Foster, wife and husband, Plaintiffs,

v.

**UNITED STATES of America, Defendant.**

No. 92–307–CIV–ORL–19.

United States District Court, M.D. Florida.

April 26, 1994.

Dougald B. Leitch, Orlando, FL, for plaintiffs.

Asst. U.S. Attys. Roberto Moreno, Orlando, FL, and Whitney L. Schmidt, Tampa, FL, for defendant U.S.

## *ORDER*

FAWSETT, District Judge.

This case was tried to the Court sitting as jury beginning April 11, 1994. Plaintiff Kathryn Foster brings a claim against Defendant United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680, alleging that she suffered injuries when a postal vehicle struck her. Plaintiff Frank Foster, husband of Kathryn Foster, brings a derivative claim against the United States of America asserting the loss of comfort, companionship, society, consortium and the attentions of his wife caused by Defendant's negligence.

Upon consideration of the evidence and the argument of the parties, the Court enters its Order as follows.

## I. *FINDINGS OF FACT*

### A. LIABILITY

On August 13, 1990, Wayne Reese Johnson, Sr. was driving his long-life vehicle mail truck on route 2257 which included the Plaintiff's residence located on Brentwood Avenue. On five to six occasions prior to this date during the six years that Mr. Johnson was the mail carrier for this route, Plaintiff Mrs. Kathryn Foster had given him her mail directly and the two had engaged in small talk. On August 13, 1990, Mr. Johnson had delivered the mail to Plaintiff's mailbox when she called from her screened porch and asked for him to wait. Mrs. Foster ran to the mail truck as Mr. Johnson pulled slightly forward so she could give him the mail

through the right-hand door where his steering mechanism was located. As Mrs. Foster handed Mr. Johnson her mail, she asked, "Where's my mail?" Mr. Johnson replied that it was in the mailbox. Mr. Johnson stated that Mrs. Foster stepped back from his mail truck, and he began to go to the next mailbox which was located less than forty to fifty feet away. Mrs. Foster testified that she moved a step back, but that she at the same time bent over and reached into her mailbox. She testified that she was in the process of picking up her mail from her box as the mail truck began to move forward.[1]

Mr. Johnson stated that he followed the safety procedures required in checking all his rearview mirrors before he moved forward. As he began moving forward to deliver the mail to the next residence, he saw movement in his mirror. He then saw Plaintiff on the ground. Both Mr. Johnson and Mrs. Foster testified that Mr. Johnson got out of his truck and rendered assistance.

Mrs. Foster testified that she felt herself hit from the truck on the top of her head, and the next thing she knew was that Mr. Johnson was standing over her. Mrs. Foster testified that Mr. Johnson stated, "Are you all right?", and she responded that her head hurt. He then asked her what happened, and she responded that the mail truck had hit her. Mr. Johnson helped Mrs. Foster get up, and she walked back into the house.[2]

The height of the mailbox from the ground to the base of the Foster's mailbox was 29 inches. The mailbox was placed on top of the post to which it was affixed. The vertical length of the door of the mailbox was approximately 9½ inches for a total of approximately 38 inches from the top of the mailbox to the ground. On the right side of the mail truck driven by Mr. Johnson there is a reflector near the rear of the vehicle. The reflector protrudes from the side of the mail truck approximately 1½ inches. In vertical height, the reflector is approximately 1¾ inches, making it approximately 41¾ inches from the

---

1. She testified that she thought Mr. Johnson would wait, and she would say "thank you" to him.

2. Mr. Johnson and Mrs. Foster differ on whether Mrs. Foster's car was in the driveway and she leaned against it or whether she walked directly into the house from her fenced area by herself.

ground to its top and 40 inches from the ground to its bottom.

While no one testified precisely as to the cause of the accident [3], Plaintiff has proven by a preponderance of the evidence that her head and the side of the mail truck came into contact on August 13, 1990.

Plaintiff, however, had to have seen how close the mail truck was to her head when she bent over and stuck her head down to look into her mailbox. Further, from her past observations of the mail truck during its deliveries, she knew that it would be proceeding to Mr. Kalkowsky's mailbox after the mail had been delivered to her home. She did not advise Mr. Johnson that she was going to place her head between the truck and mailbox as she stepped over to get her mail, and she voluntarily put her head in a position so that it would be hit if the mail truck moved. The Court therefore assesses her negligence at fifty percent. The Court notes also that it has substantial concern about this finding in view of the many misrepresentations made by the Plaintiff during the damages portion of the trial which followed the bifurcated proceedings and the presentation of evidence on the issue of liability.

## B. DAMAGES

This case calls to mind the following admonition:

"Oh, what tangled webs we weave

When first we practice to deceive."

The testimony of the Plaintiffs was riddled with "inconsistencies", including but not limited to the following:

(1) On the day of the accident, the Plaintiff told the investigating highway patrol trooper, Ms. Kelly Elizabeth Carrick, that the mailman had tried to run her down and kill her.

(2) Mr. Foster gave at best misleading testimony on his initial appearance in the witness stand, leading the Court to believe that when he raised the mailbox to conform with the postal regulations requiring it to be 36 inches from the bottom of its base to the ground shortly following the accident, that was the only change to the mailbox in place on the date of the incident. He stated that the mailbox shown in the pictures he identified in Court was in the same condition as his mailbox on the date of the accident. It was not until his cross-examination upon being recalled during the damages phase of the trial that the Court learned the mailbox in the pictures he previously had identified was not the same mailbox involved on the day of the incident.

(3) The symptoms of the Plaintiff Mrs. Foster changed from time to time and from doctor to doctor, the changes being unrelated to any organic problem developing over time. For instance, she complained of seeing a white light to one physician but never mentioned this problem at trial. She also complained to various physicians of seeing double vision in one eye, double vision in both eyes, triple vision and other problems.

(4) Some of the complaints of Mrs. Foster were proven nonexistent by healthcare providers she visited. For instance, Dr. Sedwick, Dr. Philips, Dr. Early, and even Dr. Atkins noted that Plaintiff exaggerated or gave false complaints which they disproved by empirical tests.

(5) Mrs. Foster concealed from Dr. Philips treatments that she had received when he asked her about her treatment history.

(6) She resisted therapy provided for help to her vestibular system by therapist Helen Holliday ("Holly") Waldrop.

(7) While contending that her symptoms prohibited her from driving a vehicle since the date of the accident, her husband testified, after she denied it, that she had driven during a recent trip they took with their daughter to Tennessee in a new van they had purchased with proceeds received from a

---

**3.** Raymond Kalkowsky, the Foster's next door neighbor, testified that he saw the event and that the mail truck did not hit Mrs. Foster. However, the Court found his testimony unreliable because of the angle at which he was observing the event and also because his testimony did not comport with the unrefuted testimony of both Mrs. Foster and Mr. Johnson in that Mr. Kalkowsky stated the mail truck proceeded to his house and delivered the mail and further that he did not see Mr. Johnson get out of the mail truck.

lump sum payment due to a claim she made as a result of this accident.

(8) Mrs. Foster concealed job terminations she had suffered from her vocational rehabilitation specialist, Dr. Shahnasarian, who had been hired in part to project her future employability.

(9) Mrs. Foster also filed an affidavit that she was insolvent in the state Circuit Court in a lawsuit she brought against her mother. She and her husband both testified that at the time she filed this affidavit, and contrary to the representations contained in it, they were not insolvent.

(10) Despite her contention that she could not read without a magnifying glass and had to use a linefinder, Mrs. Foster read exhibits during her testimony at the trial without the use of either a magnifying glass or a linefinder. During her testing with Dr. Shahnasarian, he testified that she had used a magnifying glass for the whole test. Mr. Cooley, the vocational rehabilitation specialist called by the Defendant, testified that Mrs. Foster did not use a magnifying glass at any time when taking the tests which he administered.[4]

(11) Mr. and Mrs. Foster testified that Mrs. Foster could no longer watch television for long periods of time because any fast moving pictures bothered her. Their daughter testified that after the accident, she and her mother spent a great deal of time watching television.[5]

(12) Mrs. Foster testified that since the accident because of her dizziness and problems with her balance which affected her walking and caused her to require the use of a cane, she had fallen on two occasions in her home, breaking two ribs on one occasion and a third rib in the second fall. Her close friend, Donna Schoberg, who testified that she saw Mrs. Foster forty to sixty hours a week and talked to her on the telephone daily, was extremely vague when asked whether Plaintiff had broken a rib during the period of time that she had known her and finally answered that she thought Plaintiff may have broken a rib once about five years ago, which would have been prior to the accident with the mail truck.

(13) Mrs. Foster contends that her dizziness and inability to process items coming toward her when she is in a car prevents her from driving and also that driving in a car causes her to get nauseous. Ms. Schoberg testified that she had ridden a roller coaster with Mrs. Foster on at least one occasion since August 13, 1990.

(14) Mrs. Foster testified to her drug usage when she was seventeen years of age. Her testimony at trial conflicts with what she told Dr. Dano Anthony Leli, a clinical neuropsychologist who examined her after the accident with the mail truck.

(15) Finally, and importantly, Mrs. Foster has presented a letter purportedly signed by Cheryl Lerch on behalf of Health Care Professionals stating that Mrs. Foster, a licensed practical nurse, earned an average weekly wage of $450.00 while taking assignments for this agency which placed licensed practical nurses on a temporary basis. The letter provides:

> This letter as per request Ms. Foster is to verify income from March 1990 to present. Ms. Foster's average weekly income has been $450.00 (four hundred fifty) per week. This amount was reached by using total income for the time span requested and computing an average.
>
> Please feel free to contact me if I may be of any help to you. (Signed Cheryl Lerch, Vice President)

Defendant's Exhibit 20. Without making a determination as to who wrote this letter, it is clear to the Court that Mrs. Lerch was not in a position to provide this information and further from Mrs. Lerch's testimony that she probably did not write the letter. In any event, Mrs. Foster knew that the information contained in the letter was not true, and yet submitted it to the Social Security Administration, to one or more insurance carriers, and to this Court in order to obtain monetary damages.

---

**4.** Dr. Shahnasarian did not stay with the Plaintiff the whole time she was taking her tests with him. Mr. Cooley did stay with the Plaintiff during the whole time she took his test.

**5.** Mr. and Mrs. Foster's daughter, Martina Foster, walked to the witness stand in a wide spaced gait similar to that of her mother.

The lack of candor, exaggerations and outright untruthfulness of Mrs. Foster has resulted in a lack of credibility of her testimony as to damages. Further, it appears to the Court that Mrs. Foster has "shopped" for a healthcare provider[6] who could give a diagnosis to which she could conform her complaints in order to obtain a monetary recovery from the Defendant. From the slow speed of the mail truck, the closeness of Plaintiff's head to the reflector when she looked into the mailbox, the tests given to Plaintiff within two days after the accident, the testimony of the paramedic whom Plaintiff called to her home on the date of the accident, and other credible facts of record, the minor bump or tap that Mrs. Foster received on her head on August 13, 1990 from her contact with the mail truck did not result in any damage other than momentary and superficial pain.[7]

The Court notes that several imminently qualified physicians caught Plaintiff in her misrepresentations. Plaintiff finally located a healthcare provider, Dr. James S. Atkins, Jr., an Otolaryngologist and Otoneurologist who, while finding that Plaintiff had misrepresented her symptoms to him on one test, found that her vertical eye movements were not normal and therefore that she could have an injury to her vestibular system. He therefore prescribed beta and calcium blocker medication to dilate possibly narrowed blood vessels which could be causing basal artery migraines, the headaches of which she complained, and he also sent her to a vestibular rehabilitation program for her complaints of balance problems.[8]

Dr. Atkins' opinion was that Plaintiff suffered a contra coup injury[9] resulting from the Plaintiff's August 13, 1990 contact with the mail truck. His diagnosis was based on what Mrs. Foster related to him about the accident of August 13, 1990, the medical history which she provided, and her complaints, many of which cannot be documented[10] by objective tests.

Dr. Atkins did not have the benefit of hearing all of the evidence presented in this trial in arriving at his opinion. Dr. Atkins testified that he is used to patients being so frustrated from other doctors' inability to diagnose the cause of their complaints that the patients exaggerate their symptoms in order to impress upon the doctor that their complaints are real. However, in view of all the evidence, Mrs. Foster's complaints cannot be painted as mere exaggerations to obtain the attention of a healthcare provider. For instance, she changed her symptoms, especially after a doctor performed an empirical test showing a complaint which she made was nonexistent. She submitted a document containing false information in order to get insurance and social security payments, and she misrepresented such matters as whether she could watch television except for short periods of time without getting nauseated or drive a vehicle at all.

Dr. Atkins' partner, Dr. Stephen Vest Early, also a board certified Otolaryngologist, testified that the vertical eye movements diagnosed by Dr. Atkins in Mrs. Foster and on which Dr. Atkins predicated his theory of vestibular dysfunction, or vertical nystagmus, can exist in humans without causing any problem. Dr. Early testified at length concerning Mrs. Foster's exaggerations and complaints for which he could find no objective support in his tests. Further, Dr. Early

**6.** Mrs. Foster is a licensed practical nurse who advised one healthcare provider she visited that hers was "a classic case".

**7.** The Court also notes that during her testimony, the only time Mrs. Foster mentioned that her head hurt was when she recounted her conversation with Mr. Johnson in which she stated words to the effect: He asked, "Are you all right?" I said, "My head hurts." He asked, "What happened?" I said, "The truck hit me." At no other time during her testimony did Mrs. Foster state that she felt pain from this incident.

**8.** Both Dr. Atkins and therapist Holly Waldrop stated that Mrs. Foster had been terminated after

ninety days of therapy because she was not responding to this program.

**9.** This is an injury in which the blow causes the brain to shift so that it hits the other side of the head in a direction opposite from the blow and sustains damage.

**10.** For instance, Dr. Atkins stated that there is no objective test for a basal artery migraine. Further, Plaintiff's complaint of imbalance could not be objectively quantified unless it was related to some specific diagnosis.

administered a Romberg test to Plaintiff on two separate visits and noted that her symptoms were not the same during her two visits.[11] On his first administration of the Romberg test, Mrs. Foster could not bring her feet together, held onto the wall for balance and was stooped as well as engaging in gesticulation. On the second testing she brought her feet together. He concluded that her gait was not physiologic but was affective, i.e., that she was exaggerating and posturing.[12]

Dr. Early explained that while the electronystagmography test (ENG) conducted by Dr. Atkins showed that Mrs. Foster had significant vertical nystagmus, this was the only report that showed nystagmus, or the abnormal vertical eye movements, that the testing was suggestive but not conclusive of a problem, and that a person may have such vertical eye movements and not have any other problems or complaints. Despite the long, hesitating and agonizing pause which occurred after Dr. Early was asked if he would rely on the conclusion of Dr. Atkins as to the ultimate diagnosis of Plaintiff, Dr. Early finally answered "Yes." On his own examination, Dr. Early did not find any nystagmus in Plaintiff. Dr. Early stated that he would not change his opinion that Plaintiff had suffered a *very* minor injury to which she had an exaggerated response and that she should see a psychiatrist. Dr. Early gave this testimony based on all the medical information he had reviewed, which included Dr. Atkins' ENG.

This Court accepts the testimony of Dr. Early as more credible than the findings of Dr. Atkins as to the existence and cause of Plaintiff's complaints.

## II. *CONCLUSIONS OF LAW*

### A. LIABILITY

1. Mrs. Foster

The Federal Tort Claims Act ("FTCA") permits a negligence action against the Unit-

ed States of America to the same extent that such action would arise against a private individual under like circumstances. 28 U.S.C. § 2674. Florida law applies in the instant case since Orlando, Florida is "the place were the act or omission occurred." 28 U.S.C. § 1346(b); *see Doe v. United States,* 718 F.2d 1039, 1042 (11th Cir.1983).

Prior to filing suit against the United States pursuant to the FTCA, a claimant must first file an administrate claim with the appropriate Federal agency, and the claim must be finally denied by the agency. 28 U.S.C. § 2675(a). If the agency failed to make a final disposition within six months after a claim was filed, the claim is deemed denied, and the claimant may file suit thereafter. 28 U.S.C. § 2675(a).

Plaintiffs' Complaint was filed in this Court on April 8, 1992. Attached to the Complaint at Docket Entry 1, Exhibit A, is a letter from the United States Postal Service denying the administrative claim of Mrs. Foster. Therefore, Mrs. Foster complied with the requirements of 28 U.S.C. § 2675(a) prior to filing the instant lawsuit.

■ "Under Florida law, the elements of actionable negligence are: 1) a legal duty owed by defendant to plaintiff; 2) breach of the duty by defendant; and 3) injury sustained as a proximate result of the breach." *Hensley v. United States,* 728 F.Supp. 716, 721 (S.D.Fla.1989) (citations omitted). The standard of care applicable to negligence actions is one of reasonable care; "that which a reasonably careful, prudent, and cautious person would use under the circumstances." *Id.* Florida is a comparative negligence jurisdiction. *Hoffman v. Jones,* 280 So.2d 431 (Fla.1973). The analysis applied to Plaintiff's negligence claim is applied to Defendant's affirmative defense of comparative negligence.

---

**11.** Dr. Early noted that on one Romberg testing, Plaintiff walked "like a robot" with her knees locked together with much gesticulation for which he could find no physiologic reason.

**12.** Dr. Early described Mrs. Foster's complaints of dizziness, balance problems, veering to the left

when walking, and others but concluded that Mrs. Foster was histrionic, or was overstating her complaints. Particularly, he felt that Mrs. Foster's complaints of triple vision were not possible.

While the rights of motorists and pedestrians on the public highways are reciprocal, *see Bell v. A.A. Holiday Rent–A–Car, Inc.,* 304 So.2d 535, 536 (Fla. 3d DCA 1974), the instant case is not a classic "darting out" or "sudden emergency" type of case as Defendant urges. Therefore, the cases cited by Defendant which hold that the driver is not liable for striking a pedestrian who thrusts himself or herself into the vehicle's pathway are not applicable to the instant case. *See Riley v. Willis,* 585 So.2d 1024 (Fla. 5th DCA 1991); *Bell v. A.A. Holiday Rent–A–Car, Inc.,* 304 So.2d 535.

■ As the Court stated above, Plaintiff has proven by a preponderance of the evidence her claim that the mail truck hit her on the head on August 13, 1990. However, the Court finds Plaintiff Kathryn Foster fifty percent comparatively negligent because she had a duty to behave in a reasonably careful manner, which duty she breached when she bent over and reached for her mail before the mail truck cleared her mailbox. Whether the causation test is a "but for" analysis or a foreseeability analysis [13], Plaintiff's injury was a foreseeable consequence of her actions and "but for" her bending over and reaching for the mail before the mail vehicle moved, she would not have been hit on the head by the mail truck.

2. Mr. Foster

■ Defendant contends that this Court lacks subject matter jurisdiction over Mr. Foster's derivative claim for loss of consortium because Mr. Foster's administrative claim was not filed within two years after the action accrued as required by 28 U.S.C. § 2401(b). It is undisputed that Mr. Foster did not file an administrative claim with the Postal Service at the time that Mrs. Foster filed her administrative claim. Mr. Foster filed his claim on December 22, 1992 (Doc. No. 19, Exhibit B), which was more than two years after the date of the accident on August 13, 1990.

On December 17, 1992 at Docket Entry 13, this Court granted Defendant's Motion to Dismiss Amended Complaint as to Plaintiff Frank Foster because Mr. Foster failed to file a separate administrative claim before initiating his lawsuit as required by 28 U.S.C. § 2675(a). When Plaintiff requested leave to add Frank Foster as a party plaintiff, Defendant did not object. The Amended Complaint was filed naming Frank Foster as a plaintiff. The issue of whether Frank Foster could pursue his claim as a plaintiff in this case was not further addressed until trial.

Plaintiff Frank Foster contends that he can cure his failure to timely file an administrative claim under 28 U.S.C. § 2679(d)(5). However, section 2679(d)(5) does not apply to the instant case because the United States was not substituted as a party defendant in this case. "Substitution" for purposes of § 2679(d)(5) applies only when a suit is brought against an individual federal employee and the United States is substituted as the party defendant if the individual employee was acting within the scope of his or her employment. *S.J. & W. Ranch v. Lehtinen,* 913 F.2d 1538, 1543 (11th Cir.1990). This was not the situation in the instant case.

Plaintiffs also urge that the limitations period of 28 U.S.C. § 2401(b) is subject to equitable tolling; thus, Plaintiff Frank Foster's failure to timely file an administrative claim should be excused. However, Plaintiffs did not provide the Court with facts that would warrant equitable tolling. *See Irwin v. Veterans Administration,* 498 U.S. 89, 96, 111 S.Ct. 453, 457–58, 112 L.Ed.2d 435 (1990) ("the principles of equitable tolling do not apply to the garden variety of excusable neglect").

Accordingly, the derivative action of Plaintiff Frank Foster is barred because he failed to timely file an administrative claim under 28 U.S.C. § 2401(b). Plaintiff Frank Foster's claim against Defendant for loss of consortium is **DISMISSED** for lack of subject matter jurisdiction.[14]

---

13. The parties disagree on the standard to be applied in proving causation. Defendant contends that the "but for" test is used in Florida; Plaintiffs contend the test is one of foreseeability.

14. Even if Mr. Foster had pursued a timely administrative claim so his joinder as plaintiff in this case would be proper, he would be entitled to no damages for reasons expressed in this

## B. DAMAGES

■ When the credibility of the plaintiff and his or her witnesses is questioned, the court may properly find that the plaintiff has not sustained the burden of proof required by law. *See Thalrose v. United States,* 1991 WL 148502, *7 (E.D.N.Y., July 17, 1991) (the court dismissed the plaintiff's FTCA claim based on the lack of credibility of the plaintiff and his expert witness). In *Thalrose,* the court acting as factfinder stated: "It saddens me to say that the credibility of [the plaintiff and his expert witness] leaves much to be desired." *Id.* at *1. Unfortunately, there are many cases in which the court acting as factfinder dismissed a plaintiff's claim for damages based on a plaintiff's lack of credibility. *See Burgess v. United States Postal Service,* 1986 WL 8856 (S.D.N.Y., Aug. 4, 1986) (the testimony of plaintiffs claiming injuries sustained when struck by a Postal Service truck was found wholly lacking in credibility; their claims were dismissed); *Fulmer v. United States,* 133 F.Supp. 775 (D.Neb.1955) (plaintiff who claimed injuries when transported by Veterans' Administration ambulance testified falsely on whether the litter or bed was attached to the side of the ambulance; thus, the probative significance of the plaintiff's testimony in other areas of dispute was impaired).

■ It is not the function of a Court to wade through misrepresentations in order to speculate on what portions, if any, of such statements may be true. Because of the bewildering and often conflicting complaints Plaintiff has presented to the Court and to others, her demeanor while testifying, and the serious conflicts in the evidence, this Court cannot find that Plaintiff has suffered anything other than momentary and slight pain without any lasting injury which has been parlayed into a costly lawsuit in order to attempt to obtain a windfall in monetary damages. Plaintiff has failed to prove the damages she claims by a preponderance of the evidence.

For the bump on her head, Plaintiff Kathryn Foster is awarded ten ($10.00) dollars. Since the Court has found that she was fifty percent at fault in the cause of the accident, her damages are reduced by fifty percent.

■ Now technically Plaintiff is a prevailing party for purposes of awarding costs. Despite her status as a prevailing party, the Court may decline an award of costs to Plaintiff. In *Gilchrist v. Bolger,* 733 F.2d 1551 (11th Cir.1984), the court stated the following:

> The rule in this circuit is that where the trial court denies the prevailing party its costs, the court must give a reason for its denial of costs so that the appellate court may have some basis upon which to determine if the trial court acted within its discretionary power.

*Id.* at 1556. Based on the Court's finding that Plaintiff was less than truthful throughout these proceedings, the Court declines to award costs to Plaintiff.

## III. CONCLUSION

Based on the foregoing, the Court finds in favor of Plaintiff Kathryn Foster and against Defendant United States of America on Plaintiff's claim of negligence under the Federal Tort Claims Act and in favor of Defendant United States of America and against Plaintiff Kathryn Foster on Defendant's affirmative defense of comparative negligence. In assessing fault, the Court finds Plaintiff fifty (50%) percent negligent and Defendant United States of America fifty (50%) percent negligent.

As to Plaintiff Frank Foster's claim for loss of consortium, the Court dismisses his claim for lack of subject matter jurisdiction for the reasons stated above.

On the issue of damages, Plaintiff Kathryn Foster is awarded ten ($10.00) dollars. Since the Court has found that Plaintiff Mrs. Foster was fifty percent at fault in the cause of the accident, her damages are reduced by fifty percent for a total of five ($5.00) dollars. Plaintiff is not entitled to an award of costs based on Plaintiff's lack of credibility.

The Clerk of Court shall enter judgment in favor of Plaintiff Kathryn Foster and against the United States of America in the amount

opinion as to the claims of damages of his wife Mrs. Foster.

of $5.00 and against Plaintiff Frank Foster and in favor of the United States of America on Mr. Foster's loss of consortium claim. The judgment shall reflect that no costs are awarded to Plaintiff.

**DONE AND ORDERED.**